# UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF PENNSYLVANIA

RAE ANN YATES,                          :
                                        :
                    Plaintiff           :     No. 3:15-CV-2398
                                        :
        vs.                             :     (Judge Nealon)
                                        :
NANCY A. BERRYHILL,[1] Acting           :
Commissioner of Social Security,        :
                                        :
                    Defendant           :

FILED
SCRANTON

AUG 1 1 2017

PER____ DEPUTY CLERK

## MEMORANDUM

On December 14, 2015, Plaintiff, Rae Ann Yates, filed this instant appeal[2]

under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the

Social Security Administration ("SSA") denying her application for disability

insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C.

§ 1461, et seq. (Doc. 1). The parties have fully briefed the appeal. For the

---

1. Nancy A. Berryhill became the new Acting Commissioner of Social Security on January 23, 2017, and thus replaces Carolyn W. Colvin as the Defendant. See http://blog.ssa.gov/meet-our-new-acting-commissioner/. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

2. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

reasons set forth below, the decision of the Commissioner denying Plaintiff's applications for DIB will be vacated.

## **BACKGROUND**

Plaintiff protectively filed[3] her application for DIB on October 10, 2012, alleging disability beginning on September 26, 2012, due to a combination of "seizures, epilepsy, complex partial seizures, fibromyalgia, manic depression, anxiety, and migraines." (Tr. 11, 177).[4] These claims were initially denied by the Bureau of Disability Determination ("BDD")[5] on February 26, 2013. (Tr. 120). On March 27, 2013, Plaintiff filed a written request for a hearing before an administrative law judge. (Tr. 11). An oral hearing was held on August 20, 2014, before administrative law judge Sharon Zanotto, ("ALJ"), at which Plaintiff and vocational expert Paul Anderson, ("VE"), testified. (Tr. 11). On August 29, 2014, the ALJ issued a decision denying Plaintiff's application for DIB. On October 28,

3. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

4. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on March 9, 2016. (Doc. 10).

5. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

2014, Plaintiff filed a request for review with the Appeals Council. (Tr. 7). On December 1, 2015, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review. (Tr. 1-6). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on December 14, 2015. (Doc. 1). On March 9, 2016, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 9 and 10). Plaintiff filed a brief in support of her complaint on April 25, 2016. (Doc. 12). Defendant filed a brief in opposition on May 27, 2016. (Doc. 16). Plaintiff filed a reply brief on June 13, 2016. (Tr. 18).

Plaintiff was born in the United States on August 28, 1984, and at all times relevant to this matter was considered a "younger individual."[6] (Tr. 174). Plaintiff graduated from high school in 2002, and can communicate in English. (Tr. 176, 178). Her employment records indicate that she previously worked as a manager, receptionist, salesperson, secretary, and bank teller. (Tr. 222). The records of the SSA reveal that Plaintiff had earnings in the years 2000 through 2012. (Tr. 164).

---

6. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). "Younger person. If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45. See Rule 201.17 in appendix 2." 20 C.F.R. §§ 404.1563(c).

Her annual earnings range from a low of one thousand five hundred one dollars and twenty-eight cents ($1,501.28) in 2000 to a high of nineteen thousand five hundred forty-five dollars and seventy-six cents ($19,545.76) in 2011. (Tr. 164). Her total earnings during these twelve (12) years were one hundred seventy-eight thousand three hundred twenty-seven dollars and thirteen cents ($178,327.13). (Tr. 164).

In a document entitled "Function Report - Adult" filed with the SSA on November 14, 2012, Plaintiff indicated that she lived in a house with her family. (Tr. 200). From the time she woke up to the time she went to bed, Plaintiff would "lay around and sleep most days." (Tr. 201). She indicated that because of her illnesses, she was no longer able to work because of daily seizures. (Tr. 201). Her husband helped her with caring for her two children, three (3) cats, and dog. (Tr. 201). She had no problems with personal care tasks such as dressing and bathing, did not prepare meals, did the laundry, mowed the lawn, and went grocery shopping, when accompanied, for at least an hour and a half. (Tr. 201-203). She was unable to drive a car because she lost her license due to seizures. (Tr. 203). She had no trouble walking. (Tr. 205). When asked to check items which her "illnesses, injuries, or conditions affect," Plaintiff did not check lifting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, stair climbing,

4

seeing, following instructions, or using hands. (Tr. 205).

Regarding concentration and memory, Plaintiff did not need special reminders to take care of her personal needs, but did need reminders to take her medicine and to go places. (Tr. 202, 205). She could pay bills, handle a savings account, use a checkbook, and count change. (Tr. 203). She indicated that she was not able to pay attention at all due to seizures, could follow written instructions without a problem "some days," could follow spoken instructions "pretty well," was not able to finish what she started, did not handle stress well, and handled changes in routine well. (Tr. 205-206).

Socially, Plaintiff left her house to get her daughter off the bus, and went to doctor appointments and the grocery store. (Tr. 203-204). Her hobbies included reading. (Tr. 204). She did spend time with her husband, children, and parents. (Tr. 204). She had problems getting along with others when she was depressed and wanted to be alone. (Tr. 205). With regards to authority figures, she got along well with them. (Tr. 206).

Plaintiff completed a Supplemental Function Questionnaire for her seizures. (Tr. 210). She indicated that she had about five (5) to six (6) seizures a week, or twenty (20) to twenty-five (25) a month. (Tr. 210). She noted that her seizures happened when she was awake. (Tr. 210). She indicated that she had an aura

before her seizure that included numbness in her face, feeling sick, and a blank stare or unconsciousness. (Tr. 210). Plaintiff stated in this form that, during a seizure, she would lose consciousness, fall, bruise her body from falling, sometimes lose bladder control, and sometimes have body twitching and/or small convulsions. (Tr. 210). Plaintiff stated that, after her seizure, she experienced headaches, body aches, and nauseousness. (Tr. 210). Plaintiff was treated with Lamictal, but she still experienced breakthrough seizures "just as often. They are still increasing and may add another drug with this." (Tr. 210). She indicated that medication caused side effects including insomnia and sleeping all day. (Tr. 210). Her husband described her seizure as follows: "Blank stare lack of motion for a few minutes then leads to total appearance of unconsciousness. Sometimes muscular twitching, eyes twitch, sometimes making noise, crying. When coming out of it takes deep breath and confused." (Tr. 211).

At her oral hearing on August 20, 2014, Plaintiff testified that she was disabled due to seizures that began in August of 2012. (Tr. 41). Plaintiff stated that she kept a calendar log of each seizure she had, which she would then review with Dr. Khan at each visit. (Tr. 44). She stated that after a seizure, she would not recall what occurred and would end up with a headache and exhaustion that would make her lie down for the remainder of the day. (Tr. 45-46). She stated that, at

best, she was seizure-free for about four (4) weeks once she started Lamictal, but that then "it just kind of hit me and it was like a big downfall where I haven't been able to come back from it yet." (Tr. 47). She testified that she had only about one (1) seizure a month from April through June of 2013. (Tr. 47-48). She explained that "sometimes I will go two or three weeks and not have one and then I will go weeks and weeks and weeks and continuously have them." (Tr. 55). She stated that, at the time of the oral hearing, she was having several a week again. (Tr. 48). She testified that her seizures began to increase again in January of 2014 when she was hospitalized and saw Dr. Sollenberger, who increased her Vimpat dosage if approved by Dr. Khan. (Tr. 49). She stated her insurance would no longer pay for her visits to Dr. Khan so she could no longer see him, but that he kept prescribing Lamictal in conjunction with her primary care physician. (Tr. 49). During her hearing, Plaintiff seemingly had a seizure, which was on the record. (Tr. 55-63). After the seizure, Plaintiff testified that she felt tired and had a headache. (Tr. 76). She stated that if she were home, she would have been in bed sleeping after the seizure. (Tr. 80). Plaintiff further testified that she had difficulty making decisions. (Tr. 79). With regards to side effects from medications, Plaintiff stated that Vimpat made her "very, very tired," but that she had no other side effects. (Tr. 80). Plaintiff testified that she was able to do

7

housework, but not on the days she had a seizure.  (Tr. 83).

## **MEDICAL RECORDS**

On August 23, 2012, Plaintiff underwent an EEG.  (Tr. 332).  The
impression was that Plaintiff had "an abnormal EEG which demonstrated several
possibly epileptogenic potentials arising from the left frontal - anterior temporal
region.  It also demonstrated intermittent bilateral temporal slowing of unclear
significance, sometimes indicative of underlying cortical-subcortical dysfunction.
Clinical correlation is recommended."  (Tr. 332).

On August 30, 2012, Plaintiff had an appointment with CheunJu Chen,
M.D. of Parkway Neuroscience and Spine Institute.  (Tr. 390).  Plaintiff's chief
symptoms were dizziness and giddiness.  (Tr. 390).  Plaintiff described "several
spells of lightheadedness, nausea, numbness int eh face that sometimes can
progress to involve the entire body."  (Tr. 390).  It was noted that Plaintiff's
"presentation is atypical of seizures.  Her EEG was interpreted as 'possible'
epileptogenic potentials.  Although it is possible that these spells could be
complex partial seizures, in this case, would also consider other possibilities such
as complicated migraine headaches, cardiogenic syncope, or panic attacks."  (Tr.
390).  Her physical examination revealed a normal mood and affect; normal
speech and language; intact naming and repetition; normal muscle bulk and tone;

8

5/5 neck flexion and extension; intact sensation to light touch; normal reflexes; normal gait; and normal toe, heel, and tandem walk. (Tr. 393). Dr. Chen's recommendation included starting Plaintiff on "GBP for both seizure and migraine prophylaxis." (Tr. 390).

On September 11, 2012, Plaintiff had a follow-up appointment with Dr. Chen. (Tr. 395). Dr. Chen stated, "I explained to the patient that I am still not convinced that these spells are seizures. . . She is most concerned about her abnormal EEG. I explained to the patient that the clinical picture is the most important factor in her spells. Due to the varying nature of her spells, I am still not convinced that these are all seizures." (Tr. 395). Due to Plaintiff's seizure concerns, Dr. Chen initiated "LTG." (Tr. 395).

On October 2, 2012, Plaintiff had an appointment with Dr. Khan after she visited the emergency room in August of 2012 after her body went numb and slid down the wall, with Plaintiff having no memory of the incident. (Tr. 412). Her physical examination revealed a normal attention span and concentration; a normal affect and mood; normal speech; intact sensation; normal motor function; and normal deep tendon reflexes. (Tr. 413). Dr. Khan diagnosed Plalintiff with "C-LOC-REL EPIL&ES SPS w/INTRACT EPIL." (Tr. 413).

On October 10, 2012, at an appointment with Nurse Practitioner P. Lynn

Curley, it was noted that Plaintiff's Medical Problems included Seizure Disorder. (Tr. 368).

On October 11, 2012, Plaintiff had an appointment with Mehrullah Khan, M.D. at Antietam Neurology Center. (Tr. 409). It was noted that Plaintiff had been experiencing breakthrough seizures that caused her to fall and that her seizures were "still poorly controlled" despite treatment with Lamictal. (Tr. 409). Her physical examination revealed normal facial sensations; 5/5 strength in the upper and lower extremities; normal gait; and a normal sensory exam. (Tr. 409). Dr. Khan increased Plaintiff's Lamictal dose, and instructed her not to drive. (Tr. 409).

On October 29, 2012, Plaintiff underwent EEG Monitoring. (Tr. 420). The impression was the following: "periods of central sharp transients. Normal video EEG tracing." (Tr. 420). No events were recorded during the procedure. (Tr. 420).

On November 1, 2012, Plaintiff had an appointment with Dr. Khan. (Tr. 421). It was noted that Plaintiff "still has suspected seizures and on lamictal 150mg po bid. Feels there has been reduction in sz. but still getting seizures every 2 days interval. head has foggy feeling." (Tr. 421). Plaintiff's examination revealed she had normal motor function, normal sensation, and normal deep

tendon reflexes. (Tr. 422). Dr. Khan diagnosed Plaintiff with "C - GEN NONCONVULS EPILPSY W/INTRACT." (Tr. 422).

On January 3, 2013, Plaintiff had an appointment with Dr. Khan. (Tr. 409). It was noted that Plaintiff's "clinical condition has been doing quite well and the seizures are well controlled for the past four weeks. She has not had any problems. She is on Lamictal 150 mg. She takes on in the morning and two at nighttime. She is tolerating the medicines fairly well. No side effects from it so far." (Tr. 409). Her examination revealed normal facial sensations; 5/5 strength in her bilateral upper and lower extremities; normal gait; and a normal sensory exam. (Tr. 409). Dr. Khan noted that Plaintiff was able to return back to work. (Tr. 409).

On February 12, 2013, Plaintiff underwent a consultative examination performed by Dr. Moskel of Momentum Services. (Tr. 257). Dr. Moskel noted that Plaintiff had an EEG test positive for seizures. (Tr. 257). Plaintiff stated that she was able to do household chores with help from her husband when she had seizures or felt tired from her seizure medication; was able to grocery shop; took care of her children "fairly well;" played video games; read novels; and talked on the phone with friends and family. (Tr. 259). She was prescribed Lamictal for seizures. (Tr. 259). Her examination revealed she had good eye contact;

appropriate psychomotor activity and speech; a euthymic and pleasant mood, but at times slightly tearful; an appropriate affect; logical and rational thought processes; good attention and concentration; intact recent and remote memory; a normal fund of knowledge; grossly intact insight and judgment; grossly intact abstract reasoning; normal intelligence; and present impulse control. (Tr. 260-261). Her Axis III Diagnosis was "Seizure Disorder." (Tr. 261). Dr. Moskel noted that, in regards to the Medical Source Statement for Work-Related Activities, "there is really no significant impairment in any of the areas in either question 1 or 2. This is supported by the fact that she has good memory, comprehension, attention and concentration, as well as having had a very good work history for many years in the past. Again based on today's examination, clinically from a mental status standpoint, I do not see any significant impairment in those areas." (Tr. 261).

On February 14, 2013, Dr. Khan completed a Seizures Medical Source Statement. (Tr. 442). Dr. Khan stated that Plaintiff had seizures that were non-convulsive (petit mal, psychomotor or focal); that she had occasional loss of consciousness during a seizure; that she had alteration of awareness during a seizure; that Plaintiff did not always have a warning of an impending seizure; that Plaintiff experienced three (3) to four (4) seizures a week; that Plaintiff's seizures

interfered with her daily activities because she was unable to drive or work; and that her seizures caused confusion, severe headaches, communication difficulties, and fatigue with a need to sleep after a seizure. (Tr. 442-443). Dr. Khan further opined that Plaintiff was incapable of even low stress work; that she could sit, stand, and/ or walk for four (4) hours in an eight (8) hour workday; that she could frequently lift and carry up to ten (10) pounds and occasionally lift and carry up to twenty (20) pounds; that Plaintiff was compliant with her medications; and that Plaintiff would be absent "about four days per month." (Tr. 444-445).

On April 11, 2013, Plaintiff had an appointment with Dr. Khan. (Tr. 490). It was noted that Plaintiff reported having about four (4) seizures a month, that she was on Lamictal, which she was tolerating fairly well, and that EEG's performed subsequent to the initial one had been normal. (Tr. 490). Paperwork was completed for her disability. (Tr. 490).

On June 20, 2013, Plaintiff had an appointment with Dr. Khan, reporting that she had been doing the same. (Tr. 490). Dr. Khan noted that he reviewed the most recent EEG, and that her results were "not the typical person findings of the seizure disorder and there is no evidence of clear spike waver to that I could document. . ." (Tr. 490). Her physical examination was normal, and she was instructed to continue taking Lamictal. (Tr. 490).

On September 26, 2013, Plaintiff had an appointment with Dr. Khan. (Tr. 489). It was noted that Plaintiff's "clinical condition has been doing quite well as far as her seizures are concerned. The patient has some feeling sensation but has never had any electroseizures. She is on Lamictal 150 mg two pills twice a day and Relpax is 100 mg twice a day." (Tr. 489). Her physical examination revealed normal motor and sensory function. (Tr. 489). Plaintiff was prescribed Maxalt. (Tr. 489).

On January 24, 2014, Plaintiff was hospitalized for one night due to possible seizures. (Tr. 492-493). Plaintiff had no breakthrough seizures during her hospital stay. (Tr. 493). An EEG revealed Plaintiff had an "abnormal EEG recording due to the presence of rare bursts of generalize paroxysmal poly sharp and slow-wave activity during drowsiness. This type of disturbance is indicative of an underlying generalized seizure disorder. Clinical correlation is suggested." (Tr. 495). Her discharge diagnosis included "Intractable recurrent seizures," and she was advised to follow-up with Dr. Khan. (Tr. 492).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of

Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);

Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-07. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Further,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits. See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has

17

an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four, the Commissioner must determine the claimant's residual functional capacity. Id. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled. Id. "The claimant bears the ultimate burden of establishing steps one through four." Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

"At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs

existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. " Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through the date last insured of December 31, 2016. (Tr. 13). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from her alleged onset date of September 26, 2012. (Tr. 13).

At step two, the ALJ determined that Plaintiff suffered from the severe[7] combination of impairments of the following: "generalized seizure disorder, depression, anxiety and headaches (20 C.F.R. 404.1520(c))." (Tr. 13-14).

At step three of the sequential evaluation process, the ALJ found that

---

7. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). (Tr. 14-15).

At step four, the ALJ determined that Plaintiff had the RFC to perform light work with limitations. (Tr. 15-). Specifically, the ALJ stated the following:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, [Plaintiff] has the [RFC] to perform a range of light work as defined in 20 CFR 404.1567(b) except that she is limited to 4 hours of standing and walking, and 4 hours of sitting in an 8-hour workday. Due to her seizures and knee impairment, [Plaintiff] can perform frequent crouching, kneeling, stooping, balancing and crawling, occasional climbing ramps and stairs and no climbing ladders, ropes or scaffolds. As a seizure precaution, [Plaintiff] needs to avoid working with moving mechanical parts and unprotected heights. Due to the combination of her impairments, [Plaintiff] requires instructions that can be learned within one month, are repetitive short cycle tasks that require occasional decision-making and judgment and does not require precise tolerances or standards.

(Tr. 16).

At step five of the sequential evaluation process, the ALJ determined Plaintiff could perform "past relevant work as a receptionist, as generally performed in the national economy (20 CFR 404.1565)." (Tr. 20).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time between September 26, 2012, the alleged

onset date, and the date of the ALJ's decision.  (Tr. 21).

## DISCUSSION

On appeal, Plaintiff asserts the following: (1) the case should be remanded based on "new and material evidence which supports the conclusion that [Plaintiff]'s seizure disorder meets Section 11.03 of the Listings and would result in an unacceptable level of work absences;" (2) the ALJ erred in failing to rule on Plaintiff's request to reopen/ reconsider the denial of benefits based on new and material evidence; and (3) the ALJ erred in allegedly failing to address Plaintiff's "inability to handle normal work stress in her RFC findings."  (Doc. 12, p. 17-

### 1.    New and Material Evidence

Plaintiff contends that the seizure log that she obtained one (1) month after the ALJ issued an unfavorable decision is new and material evidence that warrants a "sentence six" remand.  Plaintiff argues the evidence is "new" because it provides further information regarding her seizure disorder not already reflected in the record that was before the ALJ, is "material" because the contents of the seizure log support the conclusion that her seizure disorder meets Listing 11.03, and that there was "good cause" not to present the log before the issuance of the ALJ's decision because her husband from whom she was separated refused to turn the log over to her.  (Doc. 12, pp. 17-24).  Defendant contends that the seizure log

is not "new" because it is duplicative of the testimony Plaintiff provided during her oral hearing regarding the frequency and nature of her seizures and is not "material" because it would not change the outcome of the case as the contents mimick Plaintiff's testimony regarding what happens during and after her seizures. (Doc. 16, pp. 17-19).

"Sentence six" remand allows a district court to remand a case for consideration of new evidence which was not considered by the ALJ in the initial denial of benefits. See 42 U.S.C. § 405(g). Sentence six remand is appropriate only where: (1) the evidence is new and not cumulative of what is already in the record; (2) the evidence is material, meaning there is a reasonable probability that the new evidence would change the outcome of the case; and (3) the Plaintiff shows good cause as to why the evidence was not incorporated into the earlier administrative record. Scatorchia v. Comm'r of Soc. Sec., 137 F. App'x 468, 472 (3d Cir. 2005) (citing Newhouse v. Heckler, 753 F.2d 283, 287 (3d Cir. 1985)). A Plaintiff seeking sentence six remand bears the burden of establishing each of these elements. See Dieter v. Astrue, No. 11-2023, 2012 U.S. Dist. LEXIS 50698, 2012 WL 1231821, at *3 (E.D. Pa. Mar. 21, 2012).

Upon review of these arguments and the log, it is determined that a sentence six remand is warranted. Plaintiff's seizure log presents "new" evidence that is

not merely cumulative or duplicative of the evidence in the record because it describes in greater detail the actual frequency of the seizures, the time of day they occurred, and precisely what happened before, during, and after the seizures. It is this Court's determination that this log presents a real-time picture of Plaintiff's seizures that could not be gleaned from notes taken during the doctor's visits included in the medical records or from the testimony provided by Plaintiff, who had a seizure during her oral hearing and admitted to being exhausted afterward, but was permitted by the ALJ to continue with the hearing. (Tr. 28-55). The evidence is also "material" because the more detailed description of Plaintiff's seizures found in the log could potentially lead to the conclusion that Plaintiff's non-convulsive seizures meet Impairment Listing 11.03.[8] The log provides: the exact, rather than speculative, frequency at which Plaintiff experiences seizures; detailed descriptions of loss of awareness during the seizure; and detailed descriptions of transient postictal manifestations after the seizures such as extreme

---

8. To meet or equal Listing 11.03, a plaintiff's nonconvulsive epilepsy (petit mal, psychomotor, or focal) must be documented by a detailed description of a typical seizure pattern including all associated phenomena, occurring more frequently than once weekly in spite of at least three (3) months of prescribed treatment. These episodes must also result in alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day. 20 C.F.R. Part 404, Subpart P, Appendix 1, 11.03.

exhaustion, dizziness, digestive issues, significant headaches, and a need to sleep. (Tr. 559-581). Moreover, the fact that the ALJ stated that she wanted to see "some record that somebody's keeping as far as how often it's happening" goes to prove that the log, which contains this exact information, is material. (Tr. 35). Furthermore, Plaintiff has provided "good cause" as to why she could not provide the ALJ with the log, which was because her husband from whom she was separated refused to turn the log over to her, a statement that was made by Plaintiff to the ALJ during the oral hearing. (Tr. 35-36). Because a sentence six remand is warranted, this Court declines to address the remaining allegations made by Plaintiff.

## CONCLUSION

As such, based on the aforementioned discussion, a sentence six remand under 42 U.S.C. § 405(g) is warranted. Plaintiff's appeal will be granted on this ground, and the case will be remanded to the Commissioner for consideration of the new and material evidence, namely Plaintiff's seizure log.


**DATE**: August 11, 2017

/s/ William J. Nealon
**United States District Judge**

24